

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00394-CV

_____

VICTOR MIGNOGNA, Appellant

V.

FUNIMATION PRODUCTIONS, LLC, JAMIE MARCHI, MONICA RIAL, AND
RONALD TOYE, Appellees

AND

MONICA RIAL AND RONALD TOYE, Appellants

V.

VICTOR MIGNOGNA, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-307474-19

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Wallach
Concurring Memorandum Opinion by Chief Justice Sudderth
Concurring and Dissenting Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. Introduction

The Texas Citizens Participation Act (TCPA) is an anti-SLAPP[1] statute intended "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely,[2] and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002. The TCPA "was intended to provide protection for the involvement of citizens in the exchange of ideas." *Bilbrey*, 2015 WL 1120921, at *10. To that end, the TCPA provides a procedural mechanism for dismissal of lawsuits that could unjustifiably interfere with these rights. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.002.

---

[1]"SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation," *see Miller v. Schupp*, No. 02-21-00107-CV, 2022 WL 60606, at *1 n.1 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.), which are civil actions brought for the purpose of, among other things, chilling public discussion. *Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921, at *7 (Tex. App.—Fort Worth Mar. 12, 2015, no pet.) (mem. op.).

[2]The TCPA defines the exercise of the rights of free speech and association as, respectively, "a communication made in connection with a matter of public concern" and a communication between individuals who "join together to collectively express, promote, pursue, or defend common interests." *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001. The TCPA defines a communication as "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.*

Under the TCPA,[3] the first step in the statutory burden-shifting analysis is for a defendant-movant to show by a preponderance of the evidence that the plaintiff's claim is based on, relates to, or is in response to the movant's exercise of the rights of free speech, of association, or of petition. *See id.* § 27.005(b); *Ray v. Fikes*, No. 02-19-00232-CV, 2019 WL 6606170, at *2 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.).

If the defendant-movant satisfies its burden, then to avoid dismissal, the plaintiff-nonmovant must establish "by clear and specific evidence a prima[-]facie case for each essential element of the claim in question." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c); *TotalGen Servs., LLC v. Thomassen Amcot Int'l, LLC*, No. 02-20-00015-CV, 2021 WL 210845, at *2 (Tex. App.—Fort Worth Jan. 21, 2021, no pet.) (mem. op.). If the nonmovant satisfies its clear-and-specific, prima-facie burden, the movant may still have the claims dismissed by establishing each element of a valid defense to the claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d); *SSCP Mgmt. Inc. v. Sutherland/Palumbo, LLC*, No. 02-19-00254-CV, 2020 WL 7640150, at *3 (Tex. App.—

---

[3]The most recent TCPA amendments became effective September 1, 2019, and September 1, 2021. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–12, 2019 Tex. Gen. Laws 684, 684–87 (codified at Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.010); Act of May 27, 2021, 87th Leg., R.S., ch. 915, § 3.001 (codified at Tex. Civ. Prac. & Rem. Code Ann. § 27.010). Because the instant lawsuit was filed before the effective date of these amendments, it is governed by the pre-amendment version of the TCPA, and our citations refer to that version. *See* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961–64, *amended by* Act of May 24, 2013, 83rd Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499, 2499–2500.

Fort Worth Dec. 23, 2020, pet. denied) (mem. op. on reh'g). The application of this structured burden-shifting analysis controls this case.

Appellant Victor Mignogna sued Appellees Monica Rial, Ronald Toye, Jamie Marchi, and Funimation Productions, LLC,[4] for defamation, conspiracy, tortious interference with existing contracts, tortious interference with prospective business relations, and—as to Funimation—vicarious liability for Rial, Toye, and Marchi's actions based on their postings on Twitter. Appellees moved to dismiss Mignogna's claims under the TCPA,[5] and the trial court granted their motions. At a subsequent hearing, the trial court ordered Mignogna to pay litigation expenses and attorney's fees and imposed sanctions. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009 (requiring that if the trial court orders dismissal under the TCPA, it shall award to the movant court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action and "sanctions against the party who brought the legal action as the court determines sufficient to deter the party who brought the legal action from bringing similar actions").

In eight points, Mignogna appeals, complaining that the trial court erred by finding that Appellees' evidence was legally and factually sufficient to satisfy their TCPA

---

[4]Funimation, a Sony Pictures Entertainment subsidiary, specializes in the dubbing and distribution of foreign content, mostly anime.

[5]Appellees relied only on their free-speech and association rights in their TCPA motions.

5

"first step" burden based on their evidence's lack of admissibility; by dismissing his claims; by refusing to consider his second amended petition; and by ordering him to pay sanctions and attorney's fees.

On the record before us, Appellees met their initial TCPA burden, in part because Mignogna failed to preserve his complaints about their evidence, which the trial court considered along with Mignogna's allegations in his first amended petition. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (stating that in determining whether the TCPA applies, the court initially looks to the plaintiff's allegations). And because Mignogna withdrew the principal evidence supporting his prima-facie burden before the hearing on Appellees' TCPA motions, he was unable to meet his TCPA burden on any of Appellees' claims. Accordingly, the trial court did not err by granting Appellees' TCPA motions, by imposing sanctions on Mignogna, or by awarding attorney's fees to Appellees, and we affirm this portion of the trial court's judgment.

On cross-appeal, Rial and Toye complain that the trial court should have awarded to them the full amount of attorney's fees they requested. Because we hold that the trial court's order on attorney's fees is against the great weight and preponderance of the evidence, we reverse this portion of the trial court's judgment and remand the case to the trial court on that issue. *See* Tex. R. App. P. 44.1(b).

## II. Factual Background

For more than a decade, Mignogna, Rial, and Marchi worked as anime voice actors for Funimation and appeared together at fan conventions. During that time,

6

various rumors about Mignogna's behavior had circulated to the point that he held a "rumor panel" at a 2010 fan convention to try to dispel them.

More rumors resurfaced on January 16, 2019, the same day that Funimation's major anime film starring Mignogna's voice in the lead debuted. That day, someone with the Twitter handle @hanleia tweeted, "Hey @Funimation why do you employ a known pedophile" with a link to allegations of sexual misconduct by Mignogna at anime conventions. Another person, with the Twitter handle @ActuallyAmelia tweeted, "How is Vic Mignogna still working in anime? Every time assault in fandom comes up in a conversation, no matter who I talk to, so does his name. Every time. At some point an open secret becomes common knowledge and inaction becomes inexcusable." Mignogna did not sue @hanleia or @ActuallyAmelia or any of the online magazines covering the allegations—Polygon, Anime News Network, and Gizmodo—for defamation. Instead, after meeting online with his fan club and encouraging them to speak of their positive experiences with him, Mignogna posted a tweet on January 20, issuing what he characterized as a "generic" apology for unintentionally offending anyone.

Funimation and its parent company began an investigation and terminated Mignogna's contract on January 29. Funimation commented about Mignogna's termination in a tweet on February 11. During the Mignogna-related social-media maelstrom between January and February 2019, Rial, Marchi, and Rial's fiancé Toye

published some tweets,[6] as did Mignogna, whose fans paid into a GoFundMe account, "Vic Kicks Back," set up by Nick Rekeita on February 19, to cover Mignogna's litigation expenses.[7] Mignogna sued Funimation, Rial, Toye, and Marchi in April 2019.

## III. Procedural complaints

We begin with Mignogna's procedural complaints because they are dispositive of his appeal. We review most procedural complaints for an abuse of discretion. *See In re Mahindra, USA Inc.*, 549 S.W.3d 541, 550 (Tex. 2018) (orig. proceeding) ("The abuse of discretion standard is []typically applied to procedural and other trial management determinations[.]" (quoting *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A court's failure to analyze or apply the law correctly is an abuse of discretion. *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) (orig. proceeding).

The abuse-of-discretion standard governs amended petitions, *see Dunnagan v. Watson*, 204 S.W.3d 30, 38 (Tex. App.—Fort Worth 2006, pet. denied), and evidentiary rulings, *see Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). In

---

[6]We will address the subject tweets in our TCPA analysis below.

[7]By the time of the attorney's-fees hearing in November 2019, Mignogna's GoFundMe account contained $261,700.

8

contrast, a trial court generally has a ministerial duty to enforce a Rule 11 agreement once it exercises its discretion to determine the agreement's validity. *See In re I.G.*, No. 02-21-00119-CV, 2021 WL 3556955, at *3 (Tex. App.—Fort Worth Aug. 12, 2021, pet. denied) (mem. op.); *see also Univ. of Tex. at Brownsville v. Ramos*, No. 13-11-00302-CV, 2012 WL 256137, at *3 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2012, pet. denied) (mem. op.) ("Where there is a valid Rule 11 agreement that is not subject to any exception such as fraud or mistake, the trial court has a ministerial duty to enforce its terms.").

## A. Mignogna's late-filed second amended petition

In his sixth point, Mignogna argues that the trial court erred by not considering his second amended petition and its attachments in deciding whether he had met his burden to defeat Appellees' TCPA motions.

Funimation filed its TCPA motion on July 1, 2019. Rial, Toye, and Marchi filed their TCPA motions on July 19. The motions were originally set for a hearing on August 8, but the parties agreed to move the hearing to September 6 to allow Mignogna more time to respond. On August 6, the parties signed a Rule 11 agreement wherein they agreed that Mignogna would file his response to the TCPA motions by August 30. *See* Tex. R. Civ. P. 11.

According to the subsequently filed "Plaintiff's Motion for Leave to File Late Response to Defendants' TCPA Motions to Dismiss Due to Technical Issues," Mignogna's counsel unsuccessfully attempted to file Mignogna's TCPA response just

9

after midnight on Saturday, August 31. He successfully served Marchi's counsel, however, who asked him to provide a certified copy of all notary-book pages for the notarizations performed by him on August 30, the date that the affidavits of Mignogna, Chuck Huber, and Christopher Slatosch—which were attached to Mignogna's TCPA response—were signed according to Mignogna's counsel's notary stamp. At 9:04 a.m. on September 2, Rial and Toye's counsel asked Mignogna's counsel for an explanation of how Mignogna, Huber, and Slatosch could have signed their affidavits in his presence when none of them were in Tyler with him on August 30.

Mignogna's counsel successfully filed the TCPA response at midnight on September 3, the day after Labor Day, along with a motion for leave to file the late response due to technical issues. In addition to the three affidavits described above, Mignogna's counsel attached to the TCPA motion the depositions of Mignogna, Rial, and Toye, along with 342 tweets that were attached as exhibits to Toye's deposition; the unsworn declaration of E.M.,[8] a convention representative who wrote the declaration in response to statements about her by the CEO of the Kawaii Kon Convention, whose affidavit was attached to Rial and Toye's TCPA motion;[9] and an

---

[8]We use initials for the names of the various nonparty affiants involved in the sexual-harassment allegations to protect their privacy. *See* Tex. R. App. P. 9.8 cmt.

[9]In the affidavit attached to Rial and Toye's TCPA motion, Faisal Ahmed, CEO of the Kawaii Kon Convention and Anime Weekend Atlanta, averred that, among other things, in 2015, E.M., a volunteer at Anime Weekend Atlanta who was Mignogna's "personal handler/assistant" and had been a die-hard Mignogna fan, asked him to not assign her to Mignogna because "he was not who [she] thought he was," and when

affidavit by Stan Dahlin regarding his recollection (none) of an incident involving Mignogna that Rial had described as having occurred at the November 2007 Izumicon—a total of eight exhibits.

When Mignogna's counsel filed the TCPA response at midnight on September 3,[10] he simultaneously filed a second amended petition containing twenty new paragraphs of factual allegations. To the second amended petition, he attached seventeen exhibits, which he described as "prima[-]facie evidence sufficient to prove each element of each claim" and referenced the exhibits in eighteen of the petition's paragraphs. Nine of the seventeen exhibits contained evidence that was not attached to the TCPA response. The remaining eight exhibits consisted of three unsworn

---

Ahmed pushed for details, "she was hesitant and uncomfortable to say anything." Ahmed stated that he learned later that year from someone else that Mignogna had forcibly kissed E.M. without her consent.

In her unsworn declaration, E.M. denied having ever been Mignogna's personal handler/assistant or die-hard fan and declared that she had no recollection of asking Ahmed not to assign her to Mignogna. E.M. stated that she had made the request to the director of guest relations in charge of the American and Japanese guest handlers at Anime Weekend Atlanta and several of Ahmed's other conventions because she "was tired of being 'pigeonholed' into handling [Mignogna] at conventions" and "just wanted a change and the opportunity to work with other guests." She further stated that she had never been afraid of Mignogna and that, contrary to Ahmed's affidavit, Mignogna had "never 'forcibly kissed [her] without [her] consent.'"

[10]As pointed out by Rial and Toye's appellate counsel, although Mignogna's counsel informed the trial court that his TCPA response was late because of "technical issues," the TCPA response itself was "rife with missing citations, incomplete arguments, and other errors."

declarations (from Mignogna, Huber, and Slatosch, with the same contents as their affidavits), the three depositions, E.M.'s unsworn declaration, and Dahlin's affidavit.

Forty-five minutes after filing the TCPA response and second amended petition, Mignogna's counsel replied to opposing counsel's September 2 affidavit inquiry, stating that he would withdraw the three affidavits and that they had been "mistakenly submitted with defects in form." He filed a notice of withdrawal of the affidavits around half an hour later. At the TCPA hearing on September 6, Mignogna's counsel stated that he had filed the second amended petition after opposing counsel notified him of the defective affidavits.

Appellees objected to Mignogna's late filing of his TCPA response, to the filing of his second amended petition, and to the attempted late submission of evidence, citing surprise and their mutually agreed August 30 deadline. *See* Tex. R. Civ. P. 11, 63. Funimation also argued that under Rule of Civil Procedure 59, Mignogna could not attempt to meet his evidentiary burden by attaching evidence to his second amended petition. *See* Tex. R. Civ. P. 59 (allowing parties to make only certain items—"notes, accounts, bonds, mortgages, records, and all other written instruments, constituting, in whole or in part" a claim or defense—part of the pleadings by attaching them to the petition or answer). *But see Fawcett v. Grosu*, 498 S.W.3d 650, 659–60 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (op. on reh'g) (reviewing TCPA nonmovant's live pleadings and exhibits incorporated therein when movants failed to object).

In ruling on the TCPA motions, the trial court granted Mignogna's motion to late-file the TCPA response and deemed it timely filed but stated that because Mignogna had withdrawn the three affidavits, it did not consider them—or any evidence attached to the second amended petition. Mignogna's remaining TCPA evidence consisted of the depositions, E.M.'s declaration, and Dahlin's affidavit.

The record reflects that Mignogna essentially tried to use an amended pleading as a late TCPA response to remedy his lack of evidence and thereby avoid the parties' Rule 11 agreement deadline. The trial court has a ministerial duty to enforce a valid Rule 11 agreement, *Kerulis v. Granbury Lake Props., Inc.*, No. 2-05-247-CV, 2006 WL 1791617, at *3 (Tex. App.—Fort Worth June 29, 2006, no pet.) (mem. op.), and Mignogna did not argue in the trial court or in this appeal that the parties' Rule 11 agreement setting a deadline for the TCPA response—and therefore evidence—was invalid. Accordingly, we hold that the trial court did not abuse its discretion by refusing to consider Mignogna's second amended petition and attachments filed in violation of the Rule 11 agreement. *See EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996) (orig. proceeding);[11] *Neely v. Allen*, No. 14-19-00706-CV, 2021 WL 2154125, at *6 (Tex.

---

[11]In *EZ Pawn*, the parties entered a Rule 11 agreement whereby the defendant agreed to delay the hearing on its motion to compel so long as the plaintiff filed his response to the motion at least one *week* before the hearing. 934 S.W.2d at 91. The plaintiff did not file his response until one *day* before the hearing, and the defendant sought to enforce the Rule 11 agreement at the hearing. *Id.* The supreme court held that neither the trial court nor the court of appeals should have considered an affidavit filed in violation of the Rule 11 agreement. *Id.*

App.—Houston [14th Dist.] May 27, 2021, no pet.) (mem. op.) (citing *EZ Pawn* for the proposition that when affidavits are filed late in violation of a Rule 11 agreement on deadlines, and the opposing party seeks enforcement of the agreement in the trial court, neither the trial court nor the court of appeals can consider the affidavits). Because the trial court did not abuse it discretion by excluding Mignogna's second amended petition as being in violation of the parties' Rule 11 agreement, we need not address Mignogna's alleged Rule 59 violation. *See* Tex. R. App. P. 47.1. We overrule Mignogna's sixth point.

## B. The trial court's evidentiary rulings

In his seventh point, Mignogna enrobes his TCPA sufficiency complaint about Appellees' motions within his argument that the trial court should have struck Funimation's and Rial and Toye's evidence.[12] However, he ignores that in her TCPA motion, Marchi incorporated and adopted by reference all of the evidence attached by Funimation and by Rial and Toye to their respective TCPA motions to prove Mignogna's status as a public figure and that their respective statements were made on a matter of public concern. Mignogna did not object to Marchi's evidence or to her

---

[12]That is, Mignogna argues that the trial court "considered inadmissible evidence" in determining that he was a public figure and in determining that Funimation's and Rial and Toye's tweets related to a public controversy under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7) (including in definition of "matter of public concern"—for purposes of TCPA applicability—that an issue relates to a "public figure").

incorporation and adoption of the other parties' evidence, and he does not complain about Marchi's evidence on appeal.

Because Marchi's evidence (and Mignogna's own evidence) generally established his public-figure status and the matters of public concern, the error, if any, was harmless. *See* Tex. R. App. P. 44.1(a); *see also Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) (explaining that to preserve error for appellate review, a party must timely and specifically object to the evidence and obtain a ruling and that error is waived if the party allows the evidence to be introduced without objection); *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (stating that the general rule is that error in the admission of evidence is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection). We overrule Mignogna's seventh point without reaching the merits of his evidentiary arguments.

Because Mignogna raises no other challenge to whether Appellees met their initial TCPA burden, we consider that burden established for our analysis.[13]

---

[13]Beyond his evidentiary complaints in his seventh point, Mignogna does not challenge the applicability of the TCPA to his defamation claim based on Appellees' statements. As pointed out by Rial and Toye in their appellate brief, "Mignogna's Brief barely mentions 'Step 1' of the TCPA analysis, presumably because his Petition, together with the evidence and affidavits, show unequivocally that he sued Appellees for engaging in two prongs of protected communications: the rights to associate and speak freely." The record reflects that the TCPA applies to Appellees' statements in that all of the statements of which Mignogna complained in his first amended petition were made in a public forum (Twitter) to the anime community and other voice actors about matters of health and safety—Mignogna's alleged inappropriate sexual behavior

# IV. TCPA Analysis

In his first, second, third, fourth, and fifth points, Mignogna argues that he met his burden to establish a prima-facie case for each essential element of each of his claims. We review de novo a trial court's ruling on a TCPA motion. *UATP Mgmt., LLC v. Leap of Faith Adventures, LLC*, No. 02-19-00122-CV, 2020 WL 6066197, at *2 (Tex. App.—Fort Worth Oct. 15, 2020, pet. denied) (mem. op.) (citing *Beving v. Beadles*, 563 S.W.3d 399, 404 (Tex. App.—Fort Worth 2018, pet. denied)); *PNC Inv. Co., v. Fiamma Statler, LP*, No. 02-19-00037-CV, 2020 WL 5241190, at *3 (Tex. App.—Fort Worth Sept. 3, 2020, no pet.) (mem. op). In our review, we consider the pleadings and

---

with fans (including underage fans), convention workers, and voice actors—as part of a public discussion involving the anime- and voice-actor community. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001(2), (3), (7)(A), .005(b); *Ray*, 2019 WL 6606170, at *2.

The record also supports the trial court's finding that Mignogna met the general-purpose public-figure threshold of having "achieved such pervasive fame or notoriety" that he was a "public figure[] for all purposes and in all contexts" for defamation purposes. *Lane v. Phares*, 544 S.W.3d 881, 886 (Tex. App.—Fort Worth 2018, no pet.); *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7)(D). Mignogna had been voicing Broly in the anime series *Dragon Ball Z* since 2004 and had voiced his most famous character, Edward Elric, in *Fullmetal Alchemist*, which ended in 2009. He had also provided voice characters for so many video games that he no longer "ke[pt] track anymore," and he had voiced Broly in the *Dragon Ball Z* video games. By his own admission, he had voiced "hundreds of characters" and had been hired repeatedly for fifteen years, and his Internet Movie Database listing showed that he had been in over 356 productions. He also played Captain Kirk and self-funded the first of eleven episodes in a fan-made live-action web series called *Star Trek Continues*, of which the remaining episodes were crowdfunded, and he had starred in some other short live-action films and some Christian films. His fan club, the Risembool Rangers, was named after the hometown of his *Fullmetal Alchemist* character, and he had "roughly" 113,000 Twitter followers.

16

supporting and opposing affidavits stating the facts on which the liability is based. *Bilbrey*, 2015 WL 1120921, at *8.

Regarding the nonmovant's burden to establish by "clear and specific evidence a prima[-]facie case" for each essential element of his claims, "prima[-]facie case" is given its traditional legal meaning, which is evidence sufficient as a matter of law to establish a given fact "if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding). It is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (citation and internal quotations omitted); *see also Miller v. Watkins*, No. 02-20-00165-CV, 2021 WL 924843, at *8 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op.). "Clear and specific evidence" is not defined by either the TCPA or the common law, but our sister court has aptly summarized it as follows:

> [P]roof by clear and specific evidence is not simply "fair notice" of a claim. [citing *Lipsky*, 460 S.W.3d] at 590. Rather, under the clear and specific evidence standard, a plaintiff must provide enough detail to show the factual basis for the plaintiff[']s claim. *Id.* at 591. This is not an elevated standard, does not categorically reject circumstantial evidence, and does not impose a higher burden of proof than that required of the plaintiff at trial. *Id.*

*Harper v. Best*, 493 S.W.3d 105, 114 (Tex. App.—Waco 2016), *aff'd as modified*, 516 S.W.3d 1 (Tex. 2018). Conclusory statements and speculative evidence, however, will not support the nonmovant's burden. *Mogged v. Lindamood*, No. 02-18-00126-CV, 2020 WL 7074390, at *9 (Tex. App.—Fort Worth Dec. 3, 2020, pet. denied) (en banc mem. op. on reh'g); *Miller*, 2021 WL 924843, at *8.

The TCPA does not forbid using circumstantial evidence or rational inferences to establish a prima-facie case, but an inference is not reasonable if it is premised on mere suspicion or if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess to reach a conclusion. *Mogged*, 2020 WL 7074390, at *13 (quoting *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015)).

## A. Defamation

The elements of a defamation cause of action are

(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, at least amounting to negligence, and (4) damages, in some cases. A defamatory statement is one that "tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

*Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citations omitted); *Miller*, 2021 WL 924843, at *8.

A defamatory statement must proximately cause damages unless the statement is defamatory per se. *Mogged*, 2020 WL 7074390, at *9 (citing *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017)). A statement is defamatory per se if it accuses someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct. *Id.* at *10. Whether a statement is defamatory per se is generally a legal question. *Id.* Statements of opinion about a public figure on matters of public concern are not actionable as defamation because they cannot be proved false. *Id.* at *16. Calling someone a "sexual predator" falls within the broader principle that a speaker's

18

individual judgment that rests solely in the eye of the beholder is mere opinion. *Id.* (noting another court's explanation that unlike "convicted felon," which has an objective, verifiable meaning, "sex predator" is the sort of "loose, figurative or hyperbolic language that is immunized from defamation claims").

Furthermore, for a public-figure plaintiff, an essential element of the defamation claim is that the defendant published the alleged falsehood with "actual malice." *Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016); *Lipsky*, 460 S.W.3d at 593 ("The status of the person allegedly defamed determines the requisite degree of fault."). In this context, "actual malice" means "knowledge of, or reckless disregard for, the falsity of a statement," i.e., proof of the defendant's state of mind at the time of the publication. *Greer*, 489 S.W.3d at 443–44 (noting that the constitutional focus is on the defendant's attitude toward the truth, *not* his attitude toward the plaintiff). The mere failure to investigate the facts, by itself, is no evidence of actual malice. *Mogged*, 2020 WL 7074390, at *9 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 595 (Tex. 2002)). Likewise, the mere fact that a defamation defendant knows that a public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 639 (Tex. 2005). Proof of reckless disregard requires evidence that the defendant had serious doubts about the publication's truth. *Rodriguez v. Gonzales*, 566 S.W.3d 844, 852 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

For a TCPA nonmovant to make a prima-facie showing of the elements of defamation, the party's pleadings and evidence must establish "the facts of when, where, and what was said[;] the defamatory nature of the statements[;] and how they damaged the plaintiff." *Lipsky*, 460 S.W.3d at 591; *Miller*, 2021 WL 924843, at *9. This is because in defamation claims, context matters. *Bilbrey*, 2015 WL 1120921, at *12 (stating that without providing the context of the allegedly defamatory statements that plaintiff was "abusive," there was no basis for the trial court to conclude that the statements were defamatory per se). In construing a statement to determine whether it was defamatory, we view it as a whole in light of surrounding circumstances based on how a person of ordinary intelligence would perceive it. *Hand v. Hughey*, No. 02-15-00239-CV, 2016 WL 1470188, at *4 (Tex. App.—Fort Worth Apr. 14, 2016, no pet.) (mem. op.).

**1. No evidence of actual malice as to Marchi, Rial, or Funimation**

**a. Marchi**

Mignogna argues that Marchi defamed him through her statement that he had assaulted her by grabbing her hair, yanking her head back, and whispering something "sexual" in her ear. In his first amended petition, he alleged that on February 8, 2019, "[Marchi] tweeted that [he] had assaulted her several years prior by grabbing her hair and whispering in her ear (what he whispered she couldn't remember), that '[i]n the last

week or so, I've heard accounts of him doing this exact thing to half a dozen other

women that I personally know,' and that [Mignogna] is a 'predator.'"[14]

Marchi's entire February 8, 2019 Tweet stated,

I stand with the victims. My experience is minor in comparison to many others; however, having realized this wasn't an isolated incident, I felt compelled to share.

Several years ago, I was in the lobby at my job when I was approached by a co-worker. This guy gave me the creeps already (he gave almost all the women at my job the creeps), but I always felt like I had to be nice to him anyway because of how revered he was in the industry. As we said hello, he stood to the side of me and started running his fingers through my hair. Now, I do work in an affectionate industry; we hug a lot, and on occasion, will give a kiss on the cheek. But even for an affectionate environment, this felt off. I didn't say anything to him about it, though. It was just his fingers in my hair; I didn't think it was a big deal. At that point, he splayed his fingers, put his hand at the base of my skull, and made a fist. When he did this, he grabbed my hair close to the root, effectively preventing me from moving my head at all. He then jerked his fist, yanking my head backwards and towards him, and whispered something in my ear. I don't remember what he said specifically, but I do remember it being sexual in nature. This was not normal. This was not just a hug or a kiss on the cheek. I did not like it. I have no memory of getting out of his grasp, but I assume, 'What the f[***] are you doing?' was part of my technique.

Afterwards, I completely and utterly dismissed this experience. I dismissed the way I had been touched. I dismissed having this man grab me. I dismissed having my head jerked back. I dismissed the inappropriate comment. I dismissed this entire encounter.

I never reported this event to the company. It actually didn't even occur to me that I should have. Although, if it had occurred to me, I can't say I would have reported him. This guy was worshipped by his fans. He

---

[14]Because this is Marchi's only statement that Mignogna references in his brief, it is the only one of her statements that we will address in this appeal. *See* Tex. R. App. P. 47.1.

was worshipped by the studios because of his fans. He was the most popular voice actor on the convention circuit. Everyone treated him with kid gloves because he was the one and only Vic Mignogna. Who was I? A nobody in comparison. I didn't matter, and I knew it. Risking being blacklisted from my work and conventions simply wouldn't have been worth it.

As I look back on this moment and discuss it with my family and friends, I can see that his actions qualify as simple assault.[15] Would he have gone to jail had I pressed charges? I'm not sure. Why would people believe me over a man who holds bible studies in hotel lobbies? And even if they did, would they care about the truth if that meant tarnishing the reputation of their favorite voice actor?

In the last week or so, I've heard accounts of him doing this exact thing to half a dozen other women that I personally know. I am friends with these women, and we never told each other about our experiences. Some dismissed it, like me. Others felt too ashamed or scared to say anything. I struggle with the guilt I feel for having been so dismissive of his actions. Had I been able to speak up then, maybe less women would have had to experience what happened when they were unable to get out of [Mignogna's] grasp.

I'm speaking up now because I didn't even think about this event until I realized other women had experienced the same thing. I thought it was just me. And at first, I didn't want to say anything because my experience was not nearly as bad as what other people have suffered at the hands of this man. I wanted their stories to be heard first because they were the important ones. But, in this moment, I want the others who I know are out there to hear this: it wasn't just you. It's okay if you didn't say anything, to him or anyone else. You are not responsible for what

---

[15]Under the Penal Code, a person commits assault if, among other things, he "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." Tex. Penal Code Ann. § 22.01. And "[a]lthough trivial, everyday physical contacts" are not necessarily tortious for purposes of civil liability, "[t]aking indecent liberties with a person" is. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 802–03 (Tex. 2010) (quoting W. Page et al., Prosser and Keeton on the Law of Torts 42 & n.36 (5th ed. 1984)).

happened. You do not have to be dismissive, ashamed, or afraid. Also, I hope if anyone ever goes through a similar experience, they will know from the start that their body is not up for debate. Their body is not property of the most popular person in the room. Their body is not responsible for a company, or a show, or an artform. Their body is most definitely not responsible for the reputation and livelihood of a predator.

In her unsworn declaration, Marchi stated that she decided "to publicly state the truth about what [Mignogna] did to [her]" in early 2019 after other "women began coming out with the truth about their various experiences" with him and that she did it "so that other women who were victims of [Mignogna] or other aggressors would know that they are not alone" and to show solidarity with and empathy for those victims. Marchi further declared that she had told the truth and had since been "harassed, threatened, and lambasted" by Mignogna's supporters and his legal team even though she had "not made these statements out of malice or any desire to hurt" him and despite her own hurt and anger. Marchi stated, "[M]y intent in my outcry was always to provide an opportunity for healing and encouragement for bravery for both myself and other victims."

In his deposition, Mignogna admitted to the incident involving Marchi's hair but stated that it "was not painful, it was not hurtful, it was not sexual, and it happened at least four or five years ago, maybe longer," and he denied ever having whispered anything sexual in her ear or having had any sexual interest in her. Mignogna testified that Marchi had defamed him by publicly posting and "mischaracterizing a very casual, brief interaction in public and the lobby at Funimation" and that to his recollection, "it

23

was [a] very casual, playful interaction as happens all the time in the hallways of Funimation." However, he agreed that Marchi could have perceived the incident differently. He did not recall if he said anything in her ear but said, "If I did, it was literally something about, ooh, I love your hair, or, love it, it's awesome." He also agreed that Marchi was not the only woman whose hair he had pulled[16] and when asked if he had any evidence that Marchi did not believe the statements to be true when she wrote them, he replied, "I can't answer for her. I don't know what's in her mind. I -- I can't say whether she believes it's true or whether she was joining in to pile on. I don't know."

Mignogna's TCPA evidence did not show that Marchi had published a false statement of fact[17] or that she did so with knowledge of, or reckless disregard for, the

---

[16]Rial and Toye attached to their TCPA motion the affidavit of N.P., a member of the female dance troupe Orion's Envy, which attended Bayou Con in June 2013. N.P. described having gone to an after-convention party at which she saw Mignogna walk up to D.P., another Orion's Envy member, "grasp her hair from the back with his hand, aggressively pull her backwards, and whisper into her ear." N.P. stated that she did not hear what he said to D.P. but that afterwards, D.P. was "noticeably pissed, angry, uncomfortable, and upset." N.P.'s boyfriend also signed an affidavit about the neck-grabbing incident. He further stated that since speaking out publicly about what he had seen, he had received messages, threats, and other harassment from Mignogna's fans.

[17]*Cf. Van Der Linden v. Khan*, 535 S.W.3d 179, 198–99 (Tex. App.—Fort Worth 2017, pet. denied) (explaining that when a case implicates constitutional issues—including a public figure or matter of public concern—the burden is on the plaintiff to prove falsity, not upon the defendant to prove truth). In *Van Der Linden*, we held that the private-figure plaintiff met his TCPA burden on falsity because "under the circumstances unique to th[at] case, the same evidence that prove[d] falsity also prove[d] the requisite standard of liability." *Id.* at 201. That case involved alleged private comments made between the parties that were subsequently published by the defendant to the plaintiff's business partners. *See id. at* 198–02. Only the parties knew whether the

24

statement's truth or falsity.[18] *See Greer*, 489 S.W.3d at 443. Accordingly, the trial court did not err by granting Marchi's motion on this claim, and we overrule this portion of Mignogna's first point.

### b. Rial

In his first amended petition, Mignogna alleged that Rial had made the following statements or had taken the following actions to defame him:

plaintiff had actually made the comments, so under the negligence standard, he met his TCPA prima-facie burden on falsity and negligence when he denied in his affidavit that the conversation ever took place. *Id.* at 185, 201–02.

Here, in contrast, Marchi stated that Mignogna whispered something sexual in her ear, and in his deposition, he first denied whispering anything and then stated that he did not recall but added, "*If* I did, it was literally something about, ooh, I love your hair, or, love it, it's awesome." [Emphasis added.] As a public-figure plaintiff, Mignogna had the burden on falsity and actual malice but provided nothing but speculation. *See Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 833 (Tex. App.—Fort Worth 2008, no pet.) ("Speculation is not evidence."); *cf. Miller*, 2021 WL 924843, at *11 (noting that in a "she said/she said" defamation case, when there are only two parties to a communication, a plaintiff can do no more than deny having made the statement).

[18]Although Mignogna argues in his appellate brief that he specifically denied that he did this to Marchi or anyone else, he refers us only to his unspecific January 20, 2019 tweet that "any allegations of sexual harassment . . . are COMPLETELY AND UTTERLY FALSE" and to his February 13, 2019 tweet that he characterized as a generic apology, in which he stated, "If anyone has been made uncomfortable by me, it's not for me to contradict them." *See Hearst Corp.*, 159 S.W.3d at 639. Mignogna also references the statements in his affidavit and his unsworn declaration, but he withdrew the affidavit prior to submission of the TCPA motions and his unsworn declaration containing the same information was not admitted into evidence because it was attached to his second amended petition, which the trial court did not consider.

25

- On January 16, 2019, Rial "liked" and "retweeted" a tweet by @hanleia that accused Mignogna of being "a homophobic rude asshole who has been creepy to underage female fans for over ten years."

- On January 17, 2019, Rial liked and retweeted two tweets by @marzgurl that accused Mignogna of "great volumes of sexual misconduct," that urged Funimation to "reconsider hiring Vic Mignogna as a voice actor in the future," and that initiated the hashtag "#KickVic."

- On February 6, 2019, Rial tweeted, "IT HAPPENED TO ME!"[19] and that she was "only one voice on a sea of many . . . He's hurt enough people. He's a sick man and he needs help . . . ."

- In a February 11, 2019 thread under the Funimation tweets, Rial tweeted, "There were multiple investigations[20] with testimony, proof, evidence. Companies don't

---

[19]Rial described in her deposition a 2007 incident involving Mignogna at Izumicon during which he had forcibly kissed her, pushed her onto the bed, and got on top of her after she accompanied him to his hotel room so he could show her a fan film before a dinner with Dahlin, the convention chair. Rial testified that when Dahlin came to the hotel room's door, Mignogna jumped up and answered it. Rial recounted that Dahlin had asked her if she was okay as they were leaving and that she had told him she was fine because she was "in shock the whole time." In his affidavit attached to Mignogna's TCPA response, Dahlin stated that he had no recollection of the November 2007 incident. Dahlin also stated, "*If* I had noticed Monica Rial being distressed leaving Victor Mignogna's room, I am certain that I *would* remember it." [Emphasis added.] This statement is mere speculation. *See Fieldtech Avionics*, 262 S.W.3d at 833 ("Speculation is not evidence.").

[20]In his first amended petition, Mignogna alleged that an executive from Sony, Funimation's parent company, informed him that she was investigating three sexual-harassment allegations made against him: (1) an incident at a convention six years earlier, when Rial wrote her name on a jellybean and gave it to him, and he ate it and joked that he "ate Monica"; (2) inappropriate conduct between Mignogna and two fans at a convention three years earlier; and (3) a single consensual kiss between Mignogna and a Funimation employee. Funimation attached to its TCPA motion the affidavit of the Sony executive who conducted the investigation and who averred that based on her interviews, she had "concluded that the allegations of inappropriate conduct made against Mr. Mignogna were credible." During her deposition, Rial testified that there had been "quite a few" investigations of Mignogna over the years, including one by

26

cut ties without those things. However, that information is classified. I am one of dozens of men and women who participated. Stop harassing me." She also tweeted, "And just so we're clear, he's the legal definition of harassment: Harassment is governed by state laws, but is generally defined as a course of conduct which annoys, threatens, intimidates, alarms, or puts a person in fear of their safety."

- On February 19, 2019, in a Tweet, Rial accused Mignogna of "sexual harassment,"[21] of kissing her without her consent,[22] and of treating others similarly at conventions;[23] referenced having spoken with "investigators" to "corroborate" the

ADV Films in the early 2000s, an investigation by Rooster Teeth, an investigation by Sentai Filmworks, and a few done by conventions. She stated, "I know that he's not allowed on the property at Sentai Filmworks."

[21]When asked in her deposition how many times Mignogna had taken a fistful of her hair and whispered in her ear, Rial testified, "Oh, I can't even count how many times that's happened."

[22]Rial described in her deposition that Mignogna had forcibly kissed her in 2007 at Izumicon.

[23]To their joint TCPA motion to dismiss, Rial and Toye attached affidavits from women who averred that—from as far back as 1989—Mignogna had sexually harassed them. R.M.B. stated in her affidavit that when she was a high school sophomore in 1989, Mignogna had invited her to watch a "Christian worship video" at his house, where he had partially disrobed and made inappropriate advances. K.E., a voice actor, stated in her affidavit that Mignogna had propositioned her in 2008 at a North Carolina convention and in 2010 at a Florida convention and that she had refused three convention invitations in 2019 because Mignogna planned to attend those conventions, and she was "scared of his fans and of their harassment."

They also attached affidavits from convention workers attesting to Mignogna's behavior—"inappropriately touching fans, guests, and other convention patrons," and stalking a female Japanese singer in 2007 "to the point that convention chairs . . . had to . . . assign security detail"—some of which led to his occasional banning from attending future conventions. And they attached the affidavit of Ahmed, CEO of the Kawaii Kon Convention and Anime Weekend Atlanta, who attested that he had seen Mignogna "being overly friendly with a female cosplayer" near the Funimation booth and that the cosplayer had looked very uncomfortable and had fled from Mignogna. When Ahmed reported what he had seen to a Funimation employee, she told him that was normal for Mignogna, and he informed her that if it happened at one of his

27

"testimony" of others telling stories similar to hers; and spoke of Funimation's "investigations." She stated, "The investigations were incredibly thorough. Each person was interviewed, the evidence weighed, and a decision made. Each company has to look out for the safety of their employees. In this instance, these companies felt they made the best decision to protect their employees and contract workers. Also, these companies aren't obligated to share any information with you. Many of the women who've come forward have chosen to remain anonymous, especially after seeing the way that I've been attacked. Please respect their privacy."

Mignogna argues that he specifically denied Rial's accusations against him, but to support his assertion, he primarily references his affidavit and Slatosch's affidavit, both of which he withdrew before the TCPA hearing, and his unsworn declaration and Slatosch's unsworn declaration, neither of which the trial court considered because they were attached to his second amended petition. Further, despite having attached Rial's entire deposition to his TCPA response, Mignogna provided no evidence of her state of mind with regard to the actual-malice element.

To the contrary, as to at least one of the complained-of statements, Rial testified in her deposition that her February 11, 2019 tweet—which stated, "And just so we're

_____

conventions, he would not allow Mignogna back. A former Funimation employee stated in an affidavit that he and other employees referred to the security system that Funimation had put into place to separate employees from the voice actors as "Vic Locks."

METROCON'S special-guest coordinator averred that she had met Mignogna in 2010 and had been his assistant and handler at several anime conventions. She stated that Mignogna "likes to make advances on females in their early 20's and younger" and that she had personally witnessed Mignogna grab another female voice actor (K.E.) "by the back of the head, [and] pull her hair and her head back forcibly."

clear, he's the legal definition of harassment: Harassment is governed by state laws, but is generally defined as a course of conduct which annoys, threatens, intimidates, alarms, or puts a person in fear of their safety"—contained a typo. Rial testified that she had intended to say, "*here's* the legal definition of harassment." [Emphasis added.] She stated that she had copied and pasted the definition of harassment she found on the internet into the post. Mignogna provided no evidence to refute this characterization of her statement and likewise failed to meet his burden to show a prima-facie case of each element of defamation, particularly falsity and actual malice, as to Rial in his TCPA response. Accordingly, the trial court did not err by granting Rial's motion on this claim, and we overrule this portion of Mignogna's first point.

### c. Funimation

Mignogna argues that Funimation defamed him by publishing two statements about him that, when viewed together, conveyed a false and defamatory meaning. In his first amended petition, Mignogna alleged that Funimation had defamed him when it published the following tweets on February 11, 2019:

- "Everyone, we wanted to give you an update on the Vic Mignogna situation. Following an investigation, Funimation recast Vic Mignogna in Morose Mononokean Season 2. Funimation will not be engaging Mignogna in future productions";[24] and

---

[24]Mignogna conceded in his deposition that the first Funimation tweet was not defamatory, but he argued that any reasonable person would infer that he had been terminated for sexual harassment based on Funimation's second tweet, even though Funimation did not use the word "sexual." To the contrary, evidence presented by

29

- "We do not [condone] any kind of harassment or threatening behavior being directed at anyone."

As with the other defendants, Mignogna produced no evidence to meet the actual-malice standard. Accordingly, the trial court did not err by granting Funimation's TCPA motion on Mignogna's defamation claim, and we overrule this portion of Mignogna's first point.

**2. No evidence of the context of Toye's tweets or actual malice**

In his first amended petition, Mignogna alleged that Toye made the following statements or took the following actions:

- On January 26, 2019, Toye tweeted that Mignogna was "a predator."

- On January 31, 2019, Toye tweeted that he knew of "at least 4 assaults"[25] by Mignogna and that he was "glad to see conventions cancelled."

- On February 1, 2019, Toye tweeted that he knew Mignogna was "guilty of at least 4 accounts."

---

Appellees showed that Mignogna's fans had engaged in a pattern of harassment of anyone who spoke out against him and that his fans' harassment was to what this tweet referred.

[25]During his deposition, Toye testified about Mignogna's 2007 Izumicon incident involving Rial and Mignogna's interactions with the two fans and the Funimation employee, who were all friends of his. Toye stated that Mignogna had invited the two fans to his room at a convention, and they went because they "thought he was a nice guy, a good Christian guy." Once in his room, though, Mignogna told them that he would like to see them strip, and one replied, "You're old enough to be my dad." The two fans told Toye that Mignogna became angry and defensive, stating, "I'm not that old. I look like I'm in my forties" and that Mignogna had forcibly kissed them before allowing them to leave his room.

30

- On February 2, 2019, Toye tweeted that Mignogna needed to prove himself "not to be a predator" and that Mignogna "is a predator" based on Toye's "[i]nsider knowledge" about Sony's investigation.

- On February 4, 2019, Toye tweeted multiple times that Mignogna was a "predator," called him a "perp," and posted: "He is down because he took advantage of girls, buddy. [H]ow about get a grip on reality and stop harassing people. Over 100 accounts and still more to come and you defend this sack of shit? Get a life!"

- On February 5, 2019, Toye tweeted an accusation that Mignogna was a "predator."

- On February 6, 2019, Toye tweeted that over 100 women had made accusations "of assault" against Mignogna that were "corroborated," that "[there were] mountains of testimony," and that Funimation had "proof. That's why they fired him."

- On February 13, 2019, Toye tweeted, "Evidence: He has been fired, there was an investigation[, and ] these actions have corroborated testimony."

- On February 16, 2019, Toye tweeted, "[L]et's see who walks away a registered sex offender."

- On February 18, 2019, Toye tweeted, "Their [Funimation's] decision was on things that happened to [F]unimation employees."

- On February 21, 2019, in a Tweet, Toye accused Mignogna of "assaulting" Rial.

- On February 23, 2019, in a Tweet, Toye accused Mignogna of "cheat[ing] on his fiancée,[26] assault[ing] ladies, [and] rob[bing] fans" and assaulting "way more people" than Rial.

---

[26]Rial and Toye attached the affidavit of Mignogna's former fiancée, who attested that she and Mignogna had dated from 2006 to 2010 and were engaged from 2010 to 2018. The former fiancée sponsored and attached a copy of emails she had exchanged with Mignogna between March 14 and March 22, 2019. In the first email, she accused him of having cheated on her with fans, friends, acquaintances, and strangers—including prostitutes—and of having "systematically targeted dozens upon dozens of fangirls (most at least half [his] age)," and she stated that

31

- On April 7, 2019, in a Tweet, Toye accused Mignogna of "forc[ing] himself on people in a sexual manner without consent and that resulted in assault."

Mignogna also alleged that Toye had tweeted "more than 80 times that [Mignogna had] sexually assaulted or assaulted [Rial], more than 10 times that [Mignogna had] sexually assaulted or assaulted three of [Toye's] 'very close friends,' more than 10 times that [Mignogna] has been accused of hundreds and possibly thousands of assaults, and at least 17 times that [Mignogna] is a 'predator.'"

Mignogna's pleadings and evidence had to establish "the facts of when, where, and what was said[;] the defamatory nature of the statements[;] and how they damaged [him]." *Lipsky*, 460 S.W.3d at 591. However, Mignogna merely attached 342 purported tweets by Toye without their surrounding context—the tweets to which Toye was responding—which is required to determine if a statement is defamatory per se. *Bilbrey*, 2015 WL 1120921, at *12. Further, the tweets referring to Mignogna as a "sexual predator" or variations thereof were nonactionable opinion, *Mogged*, 2020 WL 7074390,

---

private wounds were cracked open by the public declarations of other women speaking up about the harassment or abuse you inflicted upon them. And since the few who came forward openly, so very many more have reached out privately [to her and others] all of them in tears, pain, and shame. Colleagues, cosplayers, fans (one of whom was underage at the time of her 'experience' with you), and most heartbreaking of all: members of our own [*Star Trek Continues*] family.

In his responses to these emails, Mignogna did not rebut his former fiancée's statements but rather told her that he was "so ashamed and so deeply sorry" and that he was working with a counselor and was "fully committed to healing" and to "try to somehow make amends if possible."

at *16, and as with Marchi, Rial, and Funimation, Mignogna also failed to show that Toye had acted with actual malice. Because Mignogna failed to meet his burden to show a prima-facie case of defamation as to Toye, the trial court did not err by granting Toye's motion on this claim, and we overrule the remainder of Mignogna's first point.

## B. Tortious-interference claims

In a claim for tortious interference with an existing contract, the plaintiff must show that (1) the plaintiff had a valid contract with a third party, (2) the defendant willfully and intentionally interfered with the contract, (3) the defendant's interference with the contract proximately caused the plaintiff's alleged injury, and (4) the plaintiff incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (op. on reh'g).

The elements of a tortious-interference-with-prospective-business-relations claim are (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person, (2) the defendant intentionally interfered with the relationship, (3) the defendant's conduct was independently tortious or unlawful, (4) the defendant's interference proximately caused the plaintiff's alleged injury, and (5) the plaintiff suffered actual damage or loss. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Mignogna testified that he averaged attending between 20 to 30 conventions a year and by the time of his June 26, 2019 deposition, he had attended 9. He further testified that it was not unusual to not be invited to a convention he had attended the

year before "[b]ecause once the convention has you as a guest, they don't typically bring the same people back every year because of the number of people in the industry." Mignogna added, "In fact, I'm actually . . . an exception because I . . . do get invited back often to the same events, so I – if somebody doesn't invite me back, there's nothing really unusual about that." He stated that the number of conventions "fluctuates from year to year," and while some would involve written agreements, others were based on oral invitations. Mignogna agreed that he did not go back to METROCON Tampa in 2018 and was not invited back in 2019, that he had not been back to Anime Central since 2016 or 2017, and that although he was at Tekkoshocon in 2018, he was not invited back in 2019.[27] Mignogna then repeated, "As I said, typically with 70 or 80 voice actors and industry people, writers, directors, artists, they don't typically invite the same people back every year."

Mignogna admitted in his deposition that with the exception of one convention—Kameha Con—he had no written evidence, emails, text messages, or anything to show that Appellees had contacted or encouraged conventions not to invite

---

[27]As noted above, Rial and Toye attached to their TCPA motion affidavits of convention workers in which Mignogna's behavior at conventions was described.

him.[28] Further, Mignogna was able to attend Kameha Con.[29] Although Mignogna testified in his deposition that prior to 2019, to his knowledge, he had not been banned from a convention or asked not to come back, Rial and Toye's evidence—affidavits by convention officers—showed otherwise. And Mignogna's primary evidence to show that Rial and Toye had interfered with his Kameha Con contract—Slatosch's affidavit and unsworn declaration—were not admitted into evidence.[30] In his deposition, Mignogna acknowledged that he did not know of any instances when Funimation pressured a convention not to hire him or to allow him to attend, and he failed to link any specific Funimation statement to any lost business. Appellees' evidence also showed that there was substantial negative press[31] arising from claims of other individuals made

---

[28]Ahmed, the Kawaii Kon and Anime Weekend Atlanta CEO, attested that Rial, Toye, Marchi, and Funimation had not contacted him to request Mignogna's banning and that he was not aware of any signed contract with Mignogna that guaranteed his appearance at either convention; rather, "[t]he invitations for Mignogna to attend Kawaii Kon w[ere] made in the sole discretion of the management staff and could be withdrawn at any time without penalty." Ahmed also stated that since he had agreed with the victims, Mignogna's fans had targeted, stalked, and harassed him.

[29]As pointed out by Rial and Toye in their appellate brief, "With regard to Kameha Con, Mignogna admitted that he actually attended this convention under a superseding contract that he *did not enter into evidence*. Mignogna's entire claim for tortious interference is based on a single convention that he was not barred from attending."

[30]As pointed out by Rial and Toye in their appellate brief, "the thirteen references in Appellant's Brief to statements allegedly made by them to [Slatosch] are improper because that evidence was withdrawn and excluded by the trial court."

[31]To its TCPA motion, Funimation attached several articles showing media coverage, including Polygon.com's January 25, 2019 article, "Dragon Ball Super: Broly

before, around the same time, and after Appellees made the statements Mignogna complained about, and Mignogna failed to show that any conventions' decisions not to invite him stemmed from Appellees' statements rather than from routine decisions or as a response to the negative press.

On the record before us, Mignogna failed to present any evidence that he had a valid contract or would have had a valid contract but for interference by Marchi,[32] Rial,

---

voice actor responds to sexual harassment, homophobia claims," with the subtitle, "Though lots of allegations began to surface recently, some go as far back as 2010"; Anime News Network's January 30, 2019 article, "'Far from Perfect': Fans Recount Unwanted Affection from Voice Actor Vic Mignogna"; Polygon.com's February 11, 2019 article, "Funimation removes voice actor Vic Mignogna from anime, while harassment allegations keep growing"; Anime News Network's February 14, 2019 article, "Dub Voice Actor Vic Mignogna Issues Statement: 'Taking Time to Recommit to God, Seeking Help'"; Gizmodo's February 19, 2019 article, "One of Anime's Biggest Voices Accused of Sexual Harassment"; and Screenrant's February 25, 2019 article, "Anime Voice Actor Vic Mignogna Accused of Sexual Harassment," which noted that Mignogna had been accused of "a years-long history of unwanted touching, advances, and more by dozens of convention-goers and fellow voice talent" and that Mignogna "consistently argues that each of these encounters were consensual in nature." The Gizmodo article's author stated that in researching the article, she had spoken to

> more than 25 voice actors, cosplayers, industry professionals, convention employees, and former fans about their experiences with Mignogna. Many of them asked not to be named in fear of retaliation from Mignogna or his fanbase. These, along with the testimonials circulating online, paint a picture of a 56-year-old man who aggressively hugs, grabs, touches, kisses, and propositions women—often without asking for their consent. It happens at panels, in autograph lines, at private events, and behind closed doors. His behavior has become so known in the anime and comic convention communities that it's more than an open secret.

[32]When asked by the trial court at the hearing on the TCPA motions who Marchi had contacted, Mignogna's counsel replied, "She did not, as far as we can tell." When

36

Toye, or Funimation; that any such interference proximately caused him actual damage or loss; or that he was not invited to a convention because of something any of them did. Accordingly, the trial court did not err by granting Appellees' motions on these claims, and we overrule Mignogna's second and third points.

## C. Civil conspiracy and vicarious liability

A claim for conspiracy requires showing that (1) a defendant was a member of a combination of two or more persons; (2) the combination's object was to accomplish either an unlawful purpose or a lawful purpose by unlawful means; (3) the members had a meeting of the minds on the object or course of action; (4) one of the members committed an unlawful, overt act to further the object or course of action; and (5) the plaintiff suffered injury as a proximate result of the wrongful act. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). An actionable civil conspiracy exists only as to those parties who are aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement. *Id.* A conspiracy claim is a derivative tort because recovery is not based on the conspiracy but on an underlying tort. *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) ("Civil conspiracy requires an underlying tort that has caused damages."); *Bell v. Bennett*, Nos. 02-10-00481-CV, 02-11-00057-CV, 02-11-00063-CV, 2012 WL 858603, at

___

asked by the trial court about the tortious-interference-with-prospective-business-relations claim as to Marchi, Mignogna's counsel replied, "Same answer."

*13 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.). Vicarious liability is also a derivative tort. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018) (explaining that vicarious liability "arises only if the tortious act falls" within the scope of employment); *see also Nettles v. GTECH Corp.*, 606 S.W.3d 726, 738 (Tex. 2020) (noting that liability-spreading theories like derivative or vicarious liability "depend upon liability for an underlying tort, and they survive or fail alongside that tort"); *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 97 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("Broadly speaking, vicarious liability principles impute liability arising from the conduct of an active tortfeasor to another party based upon a relationship between them.").

Because Mignogna failed to establish a defamation or tortious-interference claim against any of Appellees, his derivative claim of civil conspiracy against them failed.[33]

---

[33]As pointed out by Rial and Toye in their appellate brief, although Mignogna argues that the TCPA does not apply to his conspiracy claim because the Twitter comments were public statements about private matters, he failed to raise this argument in the trial court and thus has not preserved it for our review. *See* Tex. R. App. P. 33.1. *But cf. Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018) ("We have not previously cabined our TCPA analysis to the precise legal arguments or record references a moving party made to the trial court regarding the TCPA's applicability. Our focus instead has been on the pleadings and on whether, as a matter of law, they are based on or relate to a matter of public concern."). As we note in footnote 13 above, the tweets addressed matters of public concern as to health and safety—Mignogna's alleged inappropriate sexual behavior with fans (including underage fans), convention workers, and voice actors—as part of a public discussion involving the anime- and voice-actor community. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001(2), (3), (7)(A), (D), .005(b); *Ray*, 2019 WL 6606170, at *2.

Thus, the trial court did not err by granting the TCPA motions on this claim, and we overrule Mignogna's fifth point.

Furthermore, without evidence of a tortious act by Rial or Marchi,[34] Funimation could not be held vicariously liable for them, regardless of their employee or independent-contractor status. Accordingly, we overrule Mignogna's fourth point.

## V. Attorney's Fees and Sanctions

The TCPA in effect at the time of the litigation required the trial court to award to the successful movant "reasonable attorney's fees" and sanctions, among other items. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.009(a). Mignogna challenges the imposition of attorney's fees and sanctions while Rial and Toye challenge the amount of their attorney's-fee award.

### A. Award of attorney's fees and sanctions to Appellees

In his eighth point, Mignogna argues that the attorney's fees and sanctions awarded by the trial court are improper because "the trial court improperly dismissed [Mignogna's] claims against Appellees." Because, as set out above, Mignogna's claims were properly dismissed under the TCPA, the trial court's order on fees and sanctions was not improper because it followed the statutory requirements. *See id.* Accordingly, we overrule Mignogna's eighth point.

---

[34]Mignogna alleged in his first amended petition that in addition to Marchi's and Rial's actions, Funimation was also vicariously liable for the actions of Toye, a mortgage loan officer. On appeal, Mignogna has abandoned that argument.

39

**B. Amount of fee award to Rial and Toye**

In their single cross-appeal issue, Rial and Toye complain that the final judgment "improperly awards [to them] an amount of attorneys' fees ($100,000.00) lower than the amount requested and supported by competent evidence in their motion for fees ($282,953.80)." They argue, "[T]he arbitrary manner in which the trial court awarded attorneys' fees, coupled with [their] uncontroverted evidence," requires us to reverse and render an award of fees because they faced a more complex fact pattern than Marchi or Funimation and were forced to respond to significantly more attacks by Mignogna. Rial and Toye point out that their counsel had to defend two individuals instead of just one and that they were the only defendants who were deposed and the only ones who answered discovery, as well as the ones who "bore the brunt of bad-faith litigation brought by a well-funded plaintiff bent on harassment and obstruction."

### 1. Standard of review and applicable law

Under the TCPA, a "reasonable" attorney's fee "is one that is not excessive or extreme, but rather moderate or fair." *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016). The "reasonableness" determination—a fact question—rests within the court's sound discretion. *Id.* When a claimant wishes to obtain attorney's fees from the opposing party, the claimant must prove that the requested fees are both reasonable and necessary, and these elements act as limits on the amount of fees that a prevailing party can shift to the nonprevailing party. *Rohrmoos Venture v. UTSW DVA Healthcare,*

*LLP*, 578 S.W.3d 469, 489 (Tex. 2019) (noting that the distinction between "reasonable" and "necessary" is immaterial).

A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *Iola Barker v. Hurst*, 632 S.W.3d 175, 186 (Tex. App.—Houston [1st Dist.] 2021, no pet.). To determine whether evidence is sufficient to support the trial court's exercise of discretion, we consider (1) whether the trial court had sufficient information upon which to exercise its discretion, to which we apply the legal and factual sufficiency standards of review,[35] and (2) whether the trial court erred in its application of that discretion, i.e., whether, based on the evidence before it, the trial court made a reasonable decision. *Jones-Hospod v. Maples*, No. 03-20-00407-CV, 2021 WL 3883884, at *6 (Tex. App.—Austin Aug. 31, 2021, pet. denied) (mem. op.). A

---

[35]In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When the party with the burden of proof appeals from a failure to find, the party must show that the failure to find is against the great weight and preponderance of the credible evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988); *see Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681–82 (Tex. 2006).

trial court does not abuse its discretion when its ruling is based on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009). When the trial court does not specify the basis for its attorney's-fee award, we will uphold its ruling on any basis supported by the evidence. *Iola Barker*, 632 S.W.3d at 186.

The supreme court has stated that the factfinder's starting point for calculating an attorney's-fee award is to determine the reasonable hours worked multiplied by a reasonable hourly rate and that the fee claimant bears the burden of providing sufficient evidence on both counts. *Rohrmoos*, 578 S.W.3d at 498. Sufficient evidence, at a minimum, includes evidence of (1) particular services performed; (2) who performed those services; (3) approximately when the services were performed; (4) the reasonable amount of time required to perform the services; and (5) the reasonable hourly rate for each person performing the services. *Id.* at 498, 502. Reasonableness and necessity are not dependent solely on the contractual fee arrangement between the prevailing party and its attorney; the base lodestar calculation should reflect hours reasonably expended for services necessary to the litigation and a reasonable hourly rate for the attorney to prosecute or defend successfully against the claim at issue. *Id.* at 498–99; *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012) (explaining that the trial court calculates the lodestar).

"[T]here is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be

shifted to the non-prevailing party." *Rohrmoos*, 578 S.W.3d at 499. If a claimant seeks an enhancement of the base lodestar, it must produce specific evidence showing that a higher amount is necessary to achieve a reasonable fee award, and considerations already incorporated into the base calculation may not be applied to rebut the reasonable-and-necessary-fee presumption of the base calculation. *Id.* at 501. Most *Arthur Andersen* factors—"the time and labor required," "the novelty and difficulty of the questions involved," "the skill required to perform the legal service properly," "the fee customarily charged in the locality for similar legal services," "the amount involved," "the experience, reputation, and ability of the lawyer or lawyers performing the services," "whether the fee is fixed or contingent on results obtained," "the uncertainty of collection before the legal services have been rendered," and "results obtained"—are already incorporated into the base lodestar. *Id.* at 500. The remaining *Arthur Andersen* factors—"the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer," "the time limitations imposed by the client or by the circumstances," and "the nature and length of the professional relationship with the client"—may be considered in enhancing or reducing the base calculation. *See id.* at 494, 499–500.

Even if a fee claimant's testimony is uncontroverted, a trial court is not obligated to award the requested amount. *Iola Barker*, 632 S.W.3d at 193 (citing *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 547–48 (Tex. 2009)). Attorney's fees may be proven as a matter of law in some cases by uncontroverted expert testimony if that testimony is

(1) readily controvertible if untrue; (2) clear, direct, and positive; and (3) uncontradicted by the "attendant circumstances." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). However, the "attendant circumstances" may indicate that the claimed attorney's fees are unreasonable or incredible. *Id.* Further, the recovery of attorney's fees must be reasonable under the particular circumstances of the case and bear some reasonable relationship to the amount in controversy. *Iola Barker*, 632 S.W.3d at 193. When determining an appropriate fee award, the trial court is entitled to examine the entire record and to view the matter in light of the amount in controversy, the nature of the case, and his or her personal experience as a lawyer or judge. *Id.* at 193–94.

The amount of "reasonable" attorney's fees has become a frequent subject of TCPA appeals and remands since *Rohrmoos*, which, as set out above, clarified the evidentiary standards for shifting attorney's fees. *See, e.g., Berry v. Bay, Ltd.*, 643 S.W.3d 424, 435 (Tex. App.—Corpus Christi–Edinburg 2022, no pet.) (noting that when prevailing party's attorney requested $27,816.50 in pre-appeal TCPA attorney's fees, the trial court's award of $10,000 was not an abuse of discretion when the trial court "could have determined that the times and rates reported by [the prevailing party's attorney were] excessive, inadequately documented, or duplicative"); *Iola Barker*, 632 S.W.3d at 181 (addressing claim that trial court erred by not awarding full amount of attorney's fees, costs, and expenses); *Broder v. Nexstar Broad. Grp., Inc.*, No. 03-19-00484-CV, 2021 WL 2273470, at *1 (Tex. App.—Austin June 4, 2021, no pet.) (mem. op.)

(addressing nonmovants' claim that TCPA attorney's fee award of $113,510 was excessive).

In *Iola Barker*, our sister court considered the appellants' complaint that the trial court erred by not awarding the full amount of their attorney's fees, costs, and expenses after they had prevailed on a TCPA motion. 632 S.W.3d at 181. The appellants attached detailed billing statements and the affidavits of their trial and appellate counsel and their expert on attorney's fees to their memorandum in support of attorney's fees, and the appellees had responded with affidavits on attorney's fees from their own experts. *Id.* at 184. The appellate court determined that the appellees' affidavits were conclusory and constituted no evidence to overcome the base lodestar calculation's presumptive reasonableness. *Id.* at 192–93.

The court then examined the appellants' evidence. Despite that evidence, which reflected 219.10 hours of work and total billing, after discounts, of $59,500, *id.* at 188–89, the trial court had ordered recovery of only $7,000 in attorney's fees, court costs, and expenses from one nonmovant and recovery of only $9,000 from the other, in addition to conditional appellate attorney's fees, from the nonmovants, who had sought less than $100,000 in damages. *Id.* at 184, 191, 194. The case had begun in 2017, and the movants had immediately sought dismissal under the TCPA and then spent four years pursuing that goal. *Id.* at 194. The court concluded that the trial court had abused its discretion based on the fact that the trial court's attorney's-fee awards amounted to "just 17% of appellants' evidence of attorney's fees incurred," resulting in awards

45

"reduced to approximately $1,600 in attorney's fees per appellant, per year." *Id.* The attorney's-fee awards therefore bore "no relationship to the uncontroverted evidence of attorney's fees incurred." *Id.* at 194–95. Accordingly, the court remanded the issue to the trial court for a redetermination. *Id.* at 195.

In contrast, in *Broder*, the nonmovants appealed, seeking to reverse the trial court's assessment of $112,217.50 in TCPA attorney's fees, but the court of appeals upheld the award. 2021 WL 2273470, at *1, *16, *18. The nonmovant doctor (and his company, Belleza Medspa) had sued a reporter and the reporter's broadcaster for reporting on, among other things, a patient's death after plastic surgery. *Id.* at *1–2. When the movants prevailed on their TCPA motion, they sought $124,357 in attorney's fees plus conditional appellate attorney's fees. *Id.* at *15. The movants provided testimony of the number of hours on the case by their lead attorney (123), by a partner at her firm (43.6), by an associate (81.9), and by a paralegal (26.7), and their hourly rates—$475, $575, $400, and $225, respectively. *Id.* at *17. They also provided evidence of the tasks performed and various complications, such as the nonmovants' petition, which was over 40 pages long and failed to clearly articulate the complained-of statements; the nonmovants' multiple and voluminous filings, including their TCPA response, which was over 900 pages; and dueling objections to TCPA evidence. *Id.* The nonmovants' pleadings did not specify a damages amount, but they had alleged losses that would have amounted to approximately $4 million. *Id.* at *18. The trial court set out in its order awarding $112,217.50 in attorney's fees that it had accepted the legal

team's hours and rates except for lowering the associate's hours from 81.9 to 64.9 and reducing the associate's hourly rate from $400 to $350. *Id.* at *16. After applying *Rohrmoos* to the record, the appellate court concluded that the trial court had not abused its discretion by awarding $112,217.50 in attorney's fees. *Id.* at *18.

We recently considered the amount of attorney's fees awarded under the TCPA in *Mogged.* 2020 WL 7074390, at *1. After prevailing on their TCPA motion, the movants requested $177,350 in attorney's fees, but the trial court awarded only $38,190. *Id.* at *7–8. We noted that the movants "used the lodestar method, addressed the *Arthur Andersen* factors, and presented detailed evidence of their attorney's fees." *Id.* at *18. Beyond characterizing its award as encompassing "reasonable" attorney's fees, the trial court's order did not indicate why it had reduced the requested award, and the trial court made no written fact findings. *Id.* We observed that although reduced attorney's-fee TCPA awards can be and have been upheld as a proper exercise of the trial court's discretion if conflicting evidence of reasonableness exists, based on the movants' evidence, the trial court's award was against the great weight and preponderance of the evidence, constituting an abuse of discretion. *Id.* at *18–19. Accordingly, we reversed the award and remanded the case to the trial court for a redetermination by applying *Rohrmoos*'s guidance, which the trial court did not have when awarding fees initially. *Id.* at *19.

In another TCPA case remanded for reconsideration under *Rohrmoos*, the trial court awarded to the TCPA movants $256,689 in attorney's fees. *Toledo v. KBMT*

*Operating Co.*, 581 S.W.3d 324, 326–27 (Tex. App.—Beaumont 2019, pet. denied). The appellant complained that there was insufficient evidence to support the award because the movants' attorneys had filed only one short, form motion and two strikingly similar briefs and had made only three court appearances. *Id.* at 327. The movants' attorneys had supported their request with a business records affidavit authenticating 177 pages of bills and supporting documents and an affidavit by their lead attorney in which he described his professional experience and his role as lead counsel in the case; identified the other attorneys and paralegals who participated in defending the case together with the hourly rate of each; described the course of the litigation; and averred that the charged fees were usual and customary as well as reasonable and necessary. *Id.* at 328. The movants' lead attorney subsequently testified at the attorney's-fee hearing. *Id.* Although the nonmovant objected to the movants' evidence and supported her objections to an excessive award with her attorney's affidavit, the trial court granted the movants' request to strike that affidavit—a ruling that was not challenged on appeal. *Id.* at 328–29.

On appeal, the nonmovant complained that the award was excessive because the invoices reflected substantial duplication of effort by the firm's attorneys; that the firm had over-researched legal issues by using many attorneys to perform essentially the same research; that the firm had billed for time it would have taken to do original research and writing even though it recycled the same arguments and authorities in its motions and briefs in the trial court; that the firm had billed paralegal and attorney rates

for tasks that it should have classified as clerical or ministerial work; that many tasks described in the invoices used vague terms and did not adequately describe the work performed; that the firm had billed for work the court should have eliminated as nonreimbursable; that the firm had charged for work based on invoices from local counsel whose work duplicated the same tasks performed by the firm; that the firm's attorneys had charged time for attorneys who prepared for oral argument but then did not participate in presenting the arguments; that the firm had charged for time spent communicating with the client's insurance carrier and adjuster, for researching court procedures and rules, and for obtaining extensions of time unrelated to the TCPA motion to dismiss; that the firm had presented a bill that showed a lack of billing judgment given the requested award's amount; and that the firm had charged rates higher than those prevailing in the legal market where the nonmovant sued. *Id.* at 331.

The Beaumont court agreed that the trial court had awarded an excessive fee because the movants' lead counsel's testimony was "rather conclusory" as to the reasonableness of the hours worked, and his conclusory testimony and invoices did not establish that the amount sought was reasonable when he failed to explain why the attorneys who billed for working on the case were not needlessly duplicating and revising each other's work. *Id.* The evidence before the trial court also failed to establish the amount of damages at stake in the dispute, preventing the trial court from reasonably determining whether the award was grossly disproportionate to the amount at stake on the defamation claims. *Id.* at 331–32. Our sister court reversed the award

49

and remanded the case after concluding that the trial court had failed to apply the lodestar method properly and that it had abused its discretion by failing to apply the guiding rules and principles to determine the reasonableness of the amount it awarded in attorney's fees. *Id.* at 333.

Having reviewed how we and other courts have previously treated TCPA attorney's-fee awards, both large and small, we now turn to the instant case to determine whether the trial court erred by awarding too little in attorney's fees to Rial and Toye.

### 2. Trial court's attorney's-fee order

Here, in its order awarding attorney's fees, the trial court labeled the amount of fees "reasonable and necessary" and awarded $48,137.50 to Marchi—the specific amount she had requested—and awarded to Funimation, Rial, and Toye $50,000 each despite their substantially larger requests. The trial court's order did not explain why it had reduced the fee awards requested by Rial and Toye (or Funimation), and the trial court made no written fact findings about the fee awards. When the trial court makes no fact findings, we infer all facts supported by the evidence that are necessary to support the trial court's ruling. *Jones-Hospod*, 2021 WL 3883884, at *6.

### 3. Attorney's-fee evidence

During the attorney's-fee hearing, each of Appellees' lead attorneys testified about their qualifications and work on the case. Mignogna also testified about the case but presented no evidence to contradict Appellees' attorney's-fee evidence. We will

50

review all of the attorney's-fee evidence because the record makes apparent that the trial court considered all of it in making its determination.

### a. Rial and Toye's evidence

The trial court admitted into evidence the billing records of Rial and Toye's attorneys, and J. Sean Lemoine, their lead counsel, testified that he had brought unredacted billing records to submit in camera if Mignogna's counsel challenged the redactions.

Lemoine testified that in 2000, he graduated from Vermont Law School and became licensed in Texas, and in 2004, he joined Wick Phillips at its inception and practiced commercial litigation. Lemoine stated that Wick Phillips began litigating TCPA cases in 2013, that the firm had a "pretty robust anti-SLAPP practice," and that he was "probably the lead attorney within the firm that advises on that particular statute." He had a blog, www.antislapptexas.com; wrote a version of recommended changes to the TCPA during the 2019 legislative session; gave continuing legal education presentations about the TCPA; and had litigated "at least 12 to 15 TCPA motions" through attorney's-fee hearings. He stated that he was familiar with the tasks necessary to represent a client in litigation and specifically on a TCPA motion.

In researching Tarrant County attorney's-fee rates, Lemoine testified that Wick Phillips opened a Fort Worth office in 2006, and that he had spoken with one of the attorneys in that office—who had joined from Haynes Boone—about the office's rates as well as Haynes Boone's Fort Worth office rates. He also talked to a senior-level

partner at Jackson Walker "to determine what their Fort Worth rates are" and "got additional data points" from the Kelly, Hart & Hallman partner who had worked on *In re Lipsky*, "[which] went all the way to the Texas Supreme Court on anti-SLAPP."

Lemoine also spoke with an attorney at Barnes & Thornburg who had received an award of attorney's fees in Fort Worth in February 2019. From this research, he "was able to get a range of the fees . . . kind of starting at Harris [Finley] Bogle all the way up to Jackson Walker . . . and Haynes [] Boone, they're the top end of fees." Lemoine then addressed the *Rohrmoos* factors and testified that a lawyer with 25 years' experience would command a higher rate than a first-year lawyer, as would a board-certified lawyer, or one with expertise in a particular case's topical basis. He stated that the reasonable fee under *Rohrmoos* could be calculated via a blended rate of all of the timekeepers multiplied by a total number (reasonable hours x reasonable rates) or by determining the reasonable hourly rate for each timekeeper "and then how many hours [each lawyer] should . . . have spent on a particular case or a particular activity, and then you multiply that out, and you do that for each timekeeper," followed by exercising "billing discretion" to eliminate excessive or duplicative time "or time that wasn't properly spent on recoverable issues."

Lemoine testified that his hourly rate was $515 and testified about the Wick Phillips lawyers who worked on the case with him:

- Jeff Hellberg, a double board-certified attorney with 23 years' experience, who was "one of the foremost people in terms of arguing Texas anti-SLAPP cases at the

52

Court of Appeals," and whose hourly rate was $650, which Lemoine stated was consistent for the Fort Worth area with a Jackson Walker or Haynes Boone rate but a little higher than a Kelly Hart rate;

- Jeff Mills, an attorney with 9 years' experience and an hourly rate of $470;

- Ethan Minshull, an attorney with 8 years' experience and an hourly rate of $435; and

- Zac Farrar, an attorney with 5 years' experience and an hourly rate of $395.

Lemoine also testified about two co-counsel attorneys from outside his firm—Casey Erick, who had an hourly rate of $275, and Andrea Perez, who had an hourly rate of between $275 and $300—who performed most of the factual investigation and obtained all of the affidavits supporting Toye and Rial's TCPA motion to dismiss. On cross-examination, Lemoine stated that the bottom rate for associate fees was "probably in the $250 range" and the top range was "probably 350 to 365."

Lemoine stated that he arrived at the reasonable fee based on his analysis of market rates in Dallas County and Fort Worth and that he "didn't try to ask for an enhancement." He opined that all of the rates set out above were reasonable based on his research and "the factors that you can consider under *Rohrmoos* and the Texas Disciplinary Rule[s]." He testified about his billing-discretion determinations—reductions "based on [his experience of] 19 years of litigation and six years of TCPA work"—and pointed them out in the billing records admitted into evidence.

Lemoine testified that Rial and Toye's fees through October 31 amounted to $271,923.80. The trial court admitted into evidence a summary of Lemoine's testimony. Lemoine's affidavit sponsoring his firm's billing records contained the following chart:

| Invoice | Amount | Total Hours | Deductions | Total |
|---|---|---|---|---|
| 111790 [Oct.] | $34,036.50 | 70.80 | $6,221.00 (13.4) | $27,815,50 |
| 110397 [Sept.] | $54,527.00 | 110.60 | $7,272.00 (14.0) | $47,255.00 |
| 108830 [Aug.] | $30,643.00 | 62.40 | $2,890.00 (5.5) | $27,753.00 |
| 106647 [July] | $47,577.50 | 95.70 | $3,045.95 (6.2) | $44,531.55 |
| 105110 [June] | $49,406.00 | 107.60 | $4,590.00 (10) | $44,816.00 |
| 103485 [May] | $4,319.00 | 9.8 | 0 | $4,319.00 |
| 101701 [Apr.] | $2560.50 | 5.5 | $0 | $2,560.50 |
| | | | [Total discount: $24,018.95] | Total After Discount $199,050.55 |

Lemoine added the $199,050.55 to co-counsel's $60,662.49[36] to reach $259,713.04—the total attorney's-fee amount prior to anticipated costs to secure the final judgment.

---

[36]In his affidavit, Erick stated that he had been licensed since 2002, was a shareholder at Cowles & Thompson, P.C., and had over 17 years' experience in civil trial matters. He stated that approximately 282.40 of attorney hours had been worked on the claims against Rial and Toye at $275, an agreed rate at the low end of the $275–$515 hourly rate that he said was reasonable for Tarrant County; he billed $32,418.75 in fees at one firm (Kessler Collins, P.C.) and $25,932.50 after joining Cowles & Thompson, P.C., for a total of $58,351.25. He attached his billing records to his affidavit.

Perez averred that she was an attorney at Carrington, Coleman, Sloman & Blumenthal, L.L.P., licensed since 2009, that she had worked 8.1 hours of attorney time on the case, and that her rate was $300 per hour, for a total request of $2,430.

Based on the invoices, Lemoine worked a total of 244.50 hours from April to October 2019, and multiplied by his hourly rate of $515, his billing would have been $125,917.50; Minshull worked a total of 203 hours over those same months, and multiplied by his hourly rate of $435, his billing would have been $88,305; Hellberg worked 11.50 hours over three months (July, September, and October 2019), and multiplied by his hourly rate of $650, his billing would have been $7,475; Mills worked 1.0 hour in August 2019 at an hourly rate of $470, amounting to $470; Farrar worked 2.30 hours in September 2019 at an hourly rate of $395, amounting to $908.50; and a paralegal worked .20 hours in July 2019 at an hourly rate of $185, amounting to $37. There were 462.50 total hours worked on the case by the Wicks Phillips attorneys, and their total billing, before the exercise of billing discretion, would have been $223,113. Lemoine discounted the bill by $24,018.95, for an after-discount attorney's-fee total of just over $199,000. With their co-counsels' $60,662.49 in billing, the amount prior to November was just over $259,000.

Lemoine estimated $11,250 for fees through November at a blended rate of $450 (a split between himself and Minshull) multiplied by 30 hours. He requested a total amount of $282,953.80.

Lemoine acknowledged that the $282,953.80 total amount was bigger than in other TCPA cases but explained,

> This case had a layer of complexity to it that you don't typically see in a defamation case. The first issue is that it primarily deals with Twibel, which is the people's combination of Twitter and libel. There is no real

Texas case law on Twibel, so you have to research outside of the state of Texas for that[.]

[F]urther[,] [i]t was compounded by the fact that there was something done in this case that I have never seen done before. When you proceed under a l[ibel] case, you have to include the entire context of the alleged defamatory statement because it's a publication rule, and the courts have uniformly said you have to have a context to it.

Well, here we were dealing with statements completely out of context with no surrounding what the person was responding to, who they were even talking about. At the depositions there w[ere] 200 pages of Twitter posts [with] . . . blanks all around it.

Well, that's not how Twitter works. The response is to something. In order to determine defamation, whether or not the statement was defamatory, you have to know what the context is.

That is compounded by the fact that people [who] are no longer proud of what they wrote on Twitter can make it disappear. And so we don't know and we'll never know what the context was around several hundred pages of evidence that the plaintiff tried to introduce. So that was the first issue.

The second issue is the concept of whether [being called] a sexual predator . . . is defamatory. . . . The only case to address it that I have been able to find is the Mogged . . . versus Lindamood case [which was then on appeal] . . . . And that's the only one that talks about whether or not being called a sexual predator, you know, is defamatory. So we had that particular issue.

Then we had . . . just within this, the context of this particular argument, you had a fight over public versus private distinction, because whether or not a person was either a public figure or a limited public figure changes radically the standard in which the Court evaluates defamation. So that was a big fight and, you know, in those contexts there is not always a lot of case law that is on point. So you had to do that type of research.

We were hit with a battery of evidentiary objections at every turn. This morning is a good example. Right before we walked in, we got hit with seven pages of every objection you can come up with. And that was every evidentiary issue we had. We were met with that.

We were met with continuances, things that really drove up the cost. We had to fight harder in this case than I've had to fight in most anti-SLAPP cases.

The other thing that was unusual about this case is that the plaintiff was actually put up for deposition. I've never seen that before in the 15 cases that I've done in anti-SLAPP.

You never put the plaintiff up if you don't have to.[37] And so that added a layer of cost, but it was really good for us, because we got to shut down or flesh out the lack of support for the claims in the case, and we were able to introduce that through a fairly complex anti-SLAPP motion.

Our anti-SLAPP motion in this case is the most complex anti-SLAPP motion that I've ever litigated before. There are a couple of unique issues in that . . . regard . . . there is a Communications Decency Act affirmative defense that has never been ruled on in the state of Texas with regard to what is called retweet liability, meaning I retweet something that somebody else says, am I protected by the Communications Decency Act.

There is a libel proof affirmative defense that you rarely see in defamation cases. There is a consent affirmative defense that you rarely see in defamation cases. We also had some weird vicarious liability issues.

In addition, we had some TCPA specific issues, including a fight over whether or not we could supplement the motion to dismiss. There is no case law on it. So we had to pick a fight with the . . . plaintiff over that.

He further testified that beyond the motion to dismiss itself and other filings, there was "the notary fraud issue" and the second amended petition filed three days before the hearing.

---

[37]On cross-examination, Lemoine testified that it was normal to spend 10 times the length of a deposition to prepare for it because "when you get a shot at a plaintiff in a defamation case and he goes first. That's a kill shot opportunity."

Lemoine testified that he had not billed his clients for time spent watching YouTube videos posted by Rekeita, who had set up Mignogna's GoFundMe site and to whom information about the litigation had been leaked. Lemoine said that he watched the videos because Rekeita "would actually say things that we would see showing up in motions and in hearings" and "because he tells us what the plaintiff's legal counsel is thinking[;] otherwise I would not watch him." He stated, "I had to suffer through those, but I didn't bill the client. . . . [O]nly one of us had to suffer through that, and they shouldn't have to pay for it, so I did it." Lemoine also said that he had reduced an invoice by an hour because his "having to deal with the death threats that are caused by what is being said about this case outside the courtroom has nothing to do with defending the TCPA motion," so he could not pass it along to the other side.[38]

Lemoine testified that the requested $15,526.96 in litigation costs included deposition fees and costs, Westlaw research costs, parking costs, mediation costs, and the costs of getting "witness affidavits around the country." On cross-examination, Lemoine agreed that duplicative efforts were something the trial court could consider in reducing fees. He agreed that he had coordinated with defense counsel outside his firm to avoid duplication of effort.

---

[38]Each lead attorney for Appellees testified about conditional appellate fees, but because those are not challenged, we will not address that testimony.

### b. Funimation's evidence

Funimation's lead counsel, John Volney, testified that he was a partner at Lynn, Pinker, Cox & Hurst in Dallas and that he had overseen the work in the case "by virtue of [his] experience as a litigator at the trial court level and appellate court level in the state of Texas since 1997," when he graduated from Duke Law School. He had been a partner in his firm since 2006. Regarding his methodology, Volney stated, "I went through the same methodology that Mr. Lemoine described . . ., which was to review . . . *Rohrmoos* and apply the framework that the Texas Supreme Court mandated in that case." He stated that in addition to himself as the lawyer in charge (hourly rate $500), he worked with an associate attorney (hourly rate $410) who had been licensed since 2012 and who had attended Stanford University as an undergraduate and Vanderbilt Law School, was licensed in California and Texas, and had clerked at the federal court in El Paso for two years. He also worked with an experienced paralegal (hourly rate $220) who graduated with a bachelor's degree in Business Administration in 1995 and received a paralegal certificate in 1999. Volney opined that their rates were reasonable "for substantially the same reasons as [Lemoine's]," although he said, "[T]here is really not that much of a difference in terms of the legal market" in Dallas County and that of Tarrant County: "I think it's really sort of the DFW market." Volney said his firm charged the same rates regardless of county.

Volney provided an affidavit in which he set out his reasoning on reasonable attorney's fees through entry of judgment, and his exhibits were admitted into evidence.

His redacted billing records showed the hours worked, who worked them, and the amount charged, along with a brief description of the services rendered and which items had been excluded from the billing.

From May to October, Volney worked 261.90 hours, which multiplied by his $500 rate amounted to $130,950. His associate worked 131.20 hours, which multiplied by her $410 rate was $53,792. His paralegal worked 67 hours, which multiplied by his $220 rate was $14,740. Based on the above, Funimation's counsel's total hours, including the paralegal's, amounted to 460.1—or just 2 hours fewer than Rial and Toye's counsel's total hours (not counting outside co-counsel Erick and Perez) of 462.50 and Funimation's counsel's pre-billing-discretion total would have been $199,482, or approximately the same amount as Wick Phillips' total amount sought (i.e., not counting outside co-counsel) after they applied billing discretion.

Volney stated that the case had "involved some pretty nuance[d] issues, the first amendment law and the TCPA," and noted that it was only his second TCPA motion as a litigator. He also noted that Mignogna had originally sought $1 million in damages, making it a serious case for his client, and stated that because it was a TCPA case, they "had to move rather quickly from the time the lawsuit was filed" and did not seek an extension of the TCPA deadline. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003 (setting out TCPA deadlines). He opined that the reasonable amount of attorney's fees incurred by Funimation through entry of judgment was $168,941.

Volney stated that he had exercised billing discretion, going through the invoices on an entry-by-entry basis and citing, as an example, having reduced his associate's entry by 50 percent of the time he spent "researching case law related to the TCPA." He also removed charges for time spent traveling from Dallas to Tarrant County and to attend depositions and hearings, as well as "other entries that in [his] billing discretion [he] thought could be excluded from the overall number," which had reached "just under $200,000." Volney stated that his firm was not seeking fees for the fees-and-sanctions hearing and that he had calculated a total percentage reduction of 15.2 percent, which included any redrafting and rewriting he did of his associate's work. He sought $7,504 for litigation expenses that included outside copying of exhibits for depositions and for the TCPA hearing, a court-reporter fee for the TCPA hearing, the mediation fee, Westlaw charges, court parking, and some in-house copying charges. He stated that he had brought unredacted invoices for the trial court to review in camera if the trial court wanted to see beneath the work-product and attorney-client-privilege redactions.

When asked on cross-examination why the TCPA motion was not filed until July when Funimation's plan had been to file the motion in May, Volney stated that he had waited after Mignogna's counsel decided to take depositions of Mignogna, Rial, and Toye because he "felt like [his] TCPA motion would be stronger if it occurred after those depositions had taken place," and he concluded that ultimately that strategy worked correctly.

At the conclusion of Volney's testimony, the trial court observed that Funimation's bill was $100,000 less than Rial and Toye's, and Volney agreed that Lemoine's team had spent 200 more hours to prosecute the case[39] and opined that their extra work was reasonable because the claims against Rial and Toye were different from the claims against Funimation. The trial court apparently disagreed, stating, "I mean, [Rial and Toye's counsel is the] expert. It shouldn't take him 100 more hours than you."

### c. Marchi's evidence

Marchi's counsel, Samuel H. Johnson, testified that he was one of two managers of the law firm Johnson & Sparks, PLLC, which was an iteration of several different entities he had been involved in since starting his own firm in 2012. Johnson stated that he had a bachelor's degree from the University of Texas at Austin and had attended South Texas College of Law; he had been licensed in Texas in 2008 and had "been practicing regularly throughout the Metroplex ever since," primarily in business litigation. The trial court admitted into evidence a declaration Johnson had prepared and signed in conjunction with Marchi's motion for attorney's fees and sanctions, which contained his business records, including his fee agreement with Marchi. He also brought his unredacted bills for the trial court to review in camera.

---

[39]The record reflects that Rial and Toye had incurred 290.5 additional hours, which were attributable to co-counsel outside of Wick Phillips. There was only a 2.4-hour difference between the hours worked by the Wick Phillips attorneys for Rial and Toye and the hours worked by the Lynn, Pinker, Cox & Hurst attorneys for Funimation.

Johnson testified that his standard rate was $350 per hour and that his firm had agreed to represent Marchi at $250 per hour for attorney time and $125 an hour for paralegal time, with a success bonus of $100 per hour if they were able to get the claims dismissed within six months. His paralegal, whose usual rate was $150 per hour, had been a paralegal since 1992, was a certified paralegal and member of the paralegal section of the State Bar of Texas, and had a bachelor's degree in legal studies and a master's degree in technology. He explained that his paralegal's rate was lower than that of paralegals of similar qualifications, "[b]ut we are a smaller firm and generally have smaller clients, so we also have smaller bills." Johnson stated that his firm had billed 127 hours of attorney time and 6.6 hours of paralegal time through the end of October. He had billed for his paralegal at a reduced rate of $125 in the case. This had been his first TCPA case.

Johnson testified that the $48,137.50 in attorney's fees requested by Marchi was an amount that was reasonable and necessary, and he requested conditional appellate attorney's fees.

Johnson stated, "This has been an intense case to work on. Oftentimes we would receive late filings that required our office to basically drop everything we were doing, to make sure that not only . . . we were responding as promptly as possible, but oftentimes to make sure we didn't miss anything." He was the only attorney in his small firm to work on the case and "all of the hours spent on this were not spent working for other clients or seeking out new clients." Johnson stated that he was familiar with fees

that firms of all sizes charged their clients throughout the Metroplex and other counties in the state. He used LexisNexis for legal research, and those costs, along with a receipt for parking at the courthouse and $1,500 for mediation, were included in his litigation costs.

Johnson stated that one thing that had helped keep Marchi's costs so low was that "the co-defendants . . . bore a lot of the heavy lifting on some of the legal research and getting materials prepared for the hearings and drafting some of the objections, . . . [s]o there was a lot of legal research that [he] didn't have to do for Ms. Marchi because [he] knew that the other defendants would be doing that."

The trial court asked Johnson, "So how is it possible that you could do this case for $48,000, and . . . you've never done this before . . . [a]nd he's an expert . . . on these, and it took him . . . $282,000, right?" Johnson pointed out that Lemoine had twice as many clients and to the extent that Mignogna had any actual claim pleaded against Marchi, "it was only maybe as to one tweet, which actually wasn't a part of their pleadings." Johnson also pointed out that he had "a lot less record to deal with." The trial court noted, "$234,000 difference. Either you're not billing enough or he's billing too much." Johnson replied, "A lot of people do tell me I'm not billing enough or high enough, for what it's worth."

### d. Mignogna's counsel

Mignogna did not put on any controverting attorney's-fees evidence. When asked during closing arguments if he thought the amount of Marchi's fees were

reasonable, Mignogna's counsel replied, "Ms. Marchi's attorney's fees in general, yes, they're fairly reasonable."

### e. Trial court's additional comments

During the hearing's conclusion, the trial court—obviously troubled by the range of fees from $48,137.50 to $282,953.80—stated, "[I]f you brought me a repair bill on a car or something, and one is 48,000 and one is 282,000, you can't say those are both reasonable, or that the 282,000 was reasonable. It's the same causes of action."

### 4. Analysis

As noted above, we recently addressed the award of TCPA attorney's fees in *Mogged. See* 2020 WL 7074390, at *17–19. In that case, we observed—before concluding that the court's attorney's fee award was against the great weight and preponderance of the evidence—that

> [a] trial court is not, of course, a mere rubber stamp or bean-counter; even when evidence of attorney's fees is uncontroverted, a trial court is not obligated to award the requested amount. And as part of its exercise of discretion, the court may consider the entire record and common knowledge of the participants as lawyers and judges in making its determination.

*Id.* at *18 (citations and quotation marks omitted).

The record shows that in his original petition, Mignogna sought "over $1,000,000.00" and that in his first amended petition, he changed the amount to "over $1,000,000.00 but not exceeding $5,000,000.00." And as set out above in our TCPA analysis, Mignogna brought substantially heavier allegations against Rial and Toye, who

65

were deposed, as compared to Marchi and Funimation, who were not deposed. Although each party faced the $5 million lawsuit, Mignogna's case against Rial and Toye was more complicated and therefore required more work to defend against it.

Rial and Toye attached 19 exhibits, some with multiple attachments, to their TCPA motion, and many of those exhibits were affidavits acquired from witnesses around the country. In contrast, Funimation attached 24 exhibits to its TCPA motion, but 3 were affidavits from Funimation and Sony employees, 16 were online news articles, 1 was Mignogna' internet-movie-database listing, and the remaining exhibits were Mignogna's and Funimation's tweets—all easily obtainable information as compared to Rial and Toye's exhibits. And to her TCPA motion, Marchi attached her tweet, her declaration, Mignogna's deposition, and Mignogna's electronically-stored-information-preservation and cease-and-desist letters, but she also incorporated and adopted by reference all of Funimation's and Rial and Toye's evidence attached to their TCPA motions.

The trial court had before it evidence from two other legal teams on the same side as Rial and Toye—those of Funimation and of Marchi—from which to help gauge reasonableness and necessity. *But cf. In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809–10 (Tex. 2017) (orig. proceeding) (noting that an "apples-to-oranges comparison" in the same case of plaintiff's fees to defendant's fees does not help determine whether either are reasonable or necessary). Rial and Toye's attorneys had higher rates (and more experience, including TCPA experience) than Marchi's attorney, there were more

attorneys working for Rial and Toye, and their attorneys performed substantially more work on the case than Marchi's counsel, as supported by their respective billing records and their respective TCPA motions. Lemoine, Rial and Toye's lead counsel, was licensed in 2000. His principal associate Minshull was licensed in 2011, just three years after Marchi's counsel Johnson was licensed. Funimation's lead counsel Volney, who was not a TCPA expert, was licensed in 1997 and lacked Lemoine's TCPA experience but otherwise had a comparable hourly rate to Lemoine; other than the outside co-counsel hours, Volney had billed similar hours for Funimation in this case.

By awarding essentially the same amount the trial court apparently failed to factor in all of the testimony addressing expertise and experience, as well as the distinction between a large firm's billing rate and a small firm's billing rate and the fact that Marchi's counsel had leveraged the "heavy lifting" by Rial and Toye's legal team to prevail with significantly fewer hours at a significantly lower cost. Rial and Toye's legal team, although it had more expertise in the subject matter, also had higher billing rates and more people, which they used to address the novel issues raised in this complex case that were not reached on appeal only because Mignogna failed to preserve or brief those issues.[40] Rial and Toye's team also had to address significantly more allegations against them, as set out in our TCPA analysis above.

---

[40]That is, because Mignogna failed to preserve his challenge to Appellees' evidence or to submit the necessary evidence to support his claims, we did not reach the qualified-privilege, libel-proof, and other defenses raised by Rial and Toye.

On the record before us, the trial court had ample evidence upon which to exercise its discretion. However, the trial court's comments make apparent what the record otherwise shows—that despite the *Rohrmoos* base-lodestar presumption of reasonableness, *see* 578 S.W.3d at 499, and Rial and Toye's evidence, which was not controverted by Mignogna, the trial court abused its discretion when it awarded to Rial and Toye collectively just over one-third of their requested amount of attorney's fees.

Although the trial court was not obligated to award any of the specific amounts requested by the parties' attorneys and had the discretion to reduce the amount of attorney's fees, the trial court abused its discretion by assessing such a significant reduction in light of, among other things, Marchi's counsel's testimony that he had made use of their additional work and "heavy lifting" in the case. *See Fiamma Statler, LP v. Challis*, No. 02-18-00374-CV, 2020 WL 6334470, at *18 (Tex. App.—Fort Worth Oct. 29, 2020, pet. denied) (mem. op.) (concluding that award of "approximately 5% of the . . . proven attorney's fees, which necessarily were incurred with respect to the challenged claims in the trial court and with respect to claims that [the plaintiff] argued arose from 'one of the biggest frauds . . . that has ever existed,'" in Rule 91a case was against the great weight and preponderance of the evidence). Contrary to the trial court's comments about car repair bills, legal services are not fungible,[41] nor was

---

[41] *See* Donald R. Lundberg, *Will You Take Fries for That? Bartering for Legal Services*, Res Gestae 32 (2009) ("[B]ecause neither lawyers nor legal services are fungible, there tends to be a high degree of variability in what any given lawyer can demand and what

Mignogna's case against each defendant exactly alike, and the trial court should have properly calculated each base lodestar with that in mind. *See Rohrmoos*, 578 S.W.3d at 499 (incorporating into base lodestar the *Arthur Andersen* factors such as the required time and labor, novelty and difficulty, skill, experience, and customary fees for similar legal services, among others).

Rial and Toye each supported the base lodestar calculation with more than sufficient evidence. Therefore, there is a "strong presumption" that the amount calculated using the lodestar method can be shifted to Mignogna. *See Iola Barker*, 632 S.W.3d at 194. Mignogna offered no evidence to controvert Rial and Toye's presumptive evidence. The fact that other codefendants' lawyers, with differing levels of expertise and clients with different postures in the case, had different fee totals was not sufficient to rebut the presumptions raised by Rial and Toye's lodestar evidence.

Accordingly, we sustain Rial and Toye's cross-issue and remand this portion of the case for a redetermination of a reasonable attorney's-fee award in light of the *Rohrmoos* standards.

## VI. Conclusion

Having overruled all of Mignogna's points and having sustained Rial and Toye's sole cross-issue, we affirm the trial court's judgment except for the attorney's-fee

---

any given client will pay. Some lawyers are more qualified, some practice niches are more competitive, and some clients have greater need.").

amount awarded to Rial and Toye. Having determined that the attorney's-fee amount awarded is not supported by factually sufficient evidence, we remand this issue to the trial court for a redetermination in light of the above guidance.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  August 18, 2022